**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRETT FLOYD YEOMANS,

Defendant - Appellant.

No. 06-1037

(D. Colorado)

(D.C. No. 04-CR-407-PSF)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

Following the denial of his motion to suppress, Brett Floyd Yeomans was found guilty by a jury of one count of possession of a rifle and shotgun by a previously convicted felon and one count of possession of ammunition by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). He pled guilty to a third count, possession of five grams of a mixture or substance containing methamphetamine by a person previously convicted of a drug offense, in violation of 21 U.S.C. § 841(a) and (c). After Yeomans' motions for a new trial and for

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

reconsideration of his motion to suppress were denied, the district court sentenced Yeomans to 100 months on counts one and two, and twenty-four months on count three, all to run concurrently. Yeomans appeals and we affirm.

## BACKGROUND

On May 22, 2004, the Moffat County Justice Center dispatch center informed Colorado State Trooper Marty Smith that Moffat County law enforcement personnel had learned, through a series of tips, that a gold Jeep Cherokee would be traveling on Highway 13 from Meeker, Colorado, to Craig, Colorado, and would possibly be transporting illegal narcotics. The dispatch center additionally informed Trooper Smith that the driver of the Jeep was named Steven Barley and that there were two passengers, Brett Yeomans and Brian Johnson. When Smith requested criminal histories on all three men, dispatch informed him that none had any outstanding warrants, but Yeomans was on probation and there were two restraining orders on him, involving a boy and a woman.[1] Smith did not know why the restraining orders were placed on Yeomans, but he testified he suspected they related to domestic violence. See Tr. of Mots. Hr'g at 75, Appellant's App. at 83. Smith was told that he would have

---

[1]Trooper Smith testified at the hearing on the motion to suppress that persons subject to restraining orders are not permitted to purchase firearms. Tr. of Mots. Hr'g at 11-12, Appellant's App. at 19-20.

to develop his own basis for stopping the Jeep, as the anonymous tip was an insufficient basis by itself for stopping the car.

Trooper Smith then left the dispatch center and drove southbound on Highway 13 looking for the Jeep Cherokee. Two other law enforcement personnel, Deputy Daniel Burke and Deputy Todd Wheeler, also heard and responded to the dispatch center's message.

Trooper Smith saw the Jeep Cherokee traveling towards him at eighty-two miles per hour in a sixty-five mile-per-hour zone. Smith accordingly turned around and stopped the Jeep. Deputy Burke pulled his car over behind Trooper Smith's car.

Before he approached the Jeep, Trooper Smith called dispatch to check on the Jeep's license plates. Dispatch informed Smith that records showed Barley was the registered owner and there were no other irregularities regarding the vehicle. Smith and Burke approached the Jeep together, Smith on the driver's side and Burke on the passenger's side. They observed Barley in the driver's seat and Yeomans was the only passenger.[2] As the officers approached the car, both Smith and Burke saw two long guns in cases on the back seat of the Jeep. As they approached the front of the car, they also noticed some shotgun ammunition

---

[2]As explained more fully, _infra_, at the time the officers approached the car, they had not yet identified the passenger as Yeomans. They made that determination later during the stop. For ease of reference, however, we identify Yeomans by name throughout this factual recitation.

on the dashboard on the passenger side, where Yeomans was sitting. Smith testified that his normal practice upon observing guns in a vehicle was to take them out of their cases and see whether they were loaded. He further testified, however, that because Deputy Burke was accompanying him and could watch the vehicle occupants, he did not deem that necessary. But he said that the status of the guns "was stuff that [he] was going to check later on in the contact." Tr. of Mots. Hr'g at 24, Appellant's App. at 32.

Smith asked Barley and Yeomans who owned the guns and asked if they were loaded. He was told by Yeomans that they were his (Yeomans') weapons, that they were not loaded, and that he was taking them to his residence in Craig, Colorado, for storage. Trooper Smith nonetheless testified that he "had a reason to believe [the guns] might be [loaded], with the presence of the ammunition and the weapons in the same vehicle." Id. at 57, Appellant's App. at 65.

Barley provided Trooper Smith with his driver's license and vehicle registration. Smith testified that Barley was "obviously nervous. His hands were shaking as he was trying to get his driver's license and stuff out." Id. at 25, Appellant's App. at 33. When asked why the two men were speeding, Yeomans responded that he had a medical emergency in that his nephew had been struck by a car and was in a hospital in Craig.[3] Smith told Barley that he would be issued a

---

[3]As it turned out, Smith had heard a broadcast from dispatch earlier in the day, before he became involved in the search for the Jeep, that a young boy had

(continued...)

-4-

citation for speeding. Smith and Burke then returned to Smith's patrol car with Barley's driver's license, where Smith requested an additional records check and began to write out the citation. A total time of six minutes had elapsed, from the time the officers first approached the car to the time they went back to Smith's patrol car to check Barley's license and begin writing the citation. Id. at 27, Appellant's App. at 35. The additional records check revealed nothing adverse about the Jeep or its occupants.

While Trooper Smith was sitting in his patrol car writing out the citation, he directed Deputy Burke to return to the Jeep and find out the name of Yeomans' injured nephew. Burke did so, then reported to Smith that Yeomans could not remember his injured nephew's last name. Thinking it was unusual that Yeomans did not remember his nephew's last name, Smith "stopped writing the citation," id. at 30, Appellant's App. at 38, and he and Burke walked back to the Jeep to inquire further. At this point, ten or eleven minutes had passed since the officers first stopped the Jeep. Id. at 31, Appellant's App. at 39. Smith and Burke testified that Yeomans was "very nervous," "fidgety," and unable to speak in complete sentences. Id. at 94, 96, Appellant's App. at 102, 104. Yeomans again indicated he could not remember his nephew's last name. At some point in this

[3](...continued)
been hit by a car in Meeker or Craig. During the stop, Smith found out from dispatch that the child's first name was Kolby and that he, in fact, had two last names. At some time during the traffic stop, Smith informed Yeomans and Barley that the child had been treated and released from the hospital.

phase of the stop, Smith obtained Yeomans' identification. Smith then asked Barley and Yeomans if they were carrying large quantities of cash or narcotics, to which both replied they were not. Smith asked both men for consent to search the Jeep and both consented. When they were asked to get out of the Jeep, both Barley and Yeomans did so.[4] At approximately this point in the stop, Trooper Smith requested a canine drug-detecting unit.

After Yeomans got out of the car, Deputy Burke patted him down "for weapons." Id. at 33, Appellant's App. at 41. At this point, Deputy Wheeler had also arrived at the scene. While patting Yeomans down, Burke discovered in Yeomans' pockets a marijuana pipe, a plastic bag containing suspected marijuana, and a glass vial containing suspected methamphetamine. Yeomans was handcuffed and arrested. This occurred some eighteen minutes after the Jeep was initially stopped. After Yeomans was taken to jail, a search of Yeomans at the jail revealed further drug paraphernalia and some .22 caliber ammunition in his pockets. Meanwhile, the search of the Jeep revealed, in addition to the two guns and ammunition the officers had already seen, various drugs and drug paraphernalia.

---

[4]Deputy Burke's testimony was ambiguous as to whether he asked Yeomans to get out of the car or pulled him out.

Yeomans was initially indicted on three counts of possession of firearms and ammunition by a previously convicted felon.[5] Yeomans filed a motion to suppress the evidence found and statements made following the search of the Jeep Cherokee. After conducting an evidentiary hearing, the district court denied the motion. The court found that, under Maryland v. Wilson, 519 U.S. 408, 414 (1997), and United States v. Holt, 264 F.3d 1215 (10th Cir. 2001), the officers had the right to "request[] the individuals to leave the vehicle for safety purposes." Tr. of Mots. Hr'g at 137, Appellant's App. at 144. Further, the court concluded that, given the concern that the people in the vehicle were "carrying drugs and firarms, . . . a limited patdown, consistent with Terry v. Ohio, [392 U.S. 1 (1968)] and its progeny was appropriate." Id. The court then found that the discovery of "what felt like a pipe" during the patdown of Yeomans justified the request to look at it "for safety purpose." Id. The court dismissed the significance of the confusion over the nephew's last name as well as Yeomans' alleged nervousness, but concluded that Yeomans as the "owner of the gun . . . needed to be checked out on a criminal history, particularly because of a restraining order, and it was unclear from this record whether there was a need to be concerned about whether Mr. Yeomans was going to an area where he was prohibited from particularly with a firearm." Tr. of Mots. Hr'g at 138,

---

[5]Yeomans' previous felonies were convictions for theft and attempted escape, in violation of Colorado state law.

-7-

Appellant's App. at 145. After determining that "[t]he length of the detention was not unreasonable, and . . . that consent was not necessary for the patdown and the . . . pull-out of Mr. Yeomans from the vehicle," the court denied Yeomans' motion to suppress the evidence seized from his person and the vehicle.

The government thereafter brought a superceding indictment, in which the original firearms charge in count three was deleted and replaced by a new charge of possession of five grams of a mixture or substance containing a detectable amount of methamphetamine by a person previously convicted of a drug offense, in violation of 21 U.S.C. § 844(a) and (c).

On May 9, 2005, following the severance of count three from the other two counts, Yeomans proceeded to trial before a jury on the two counts of possession of firearms and ammunition by a prohibited person. The jury found Yeomans guilty of both counts. Yeomans then pled guilty to count three relating to the methamphetamine possession, although he reserved the right to appeal issues relating to his motion to suppress.

On December 26, 2005, Yeomans filed a motion for a new trial and for reconsideration of his motion to suppress. He sought a new trial on the two firearms counts on the ground that he claimed he did not understand he had the right to testify at his trial, and he sought reconsideration of the denial of his motion to suppress on the ground that a similar motion was granted in the Colorado state case against Barley arising out of the same stop. Following an

evidentiary hearing, the district court denied both motions and imposed concurrent sentences of 100 months on the firearms and ammunition possession counts and twenty-four months on the drug possession count. This appeal followed.

Yeomans argues on appeal that "[w]hile the traffic stop was justified at its inception, Trooper Smith exceeded the permissible scope of the stop, thus violating Yeomans' Fourth Amendment rights when he requested consent to search for illegal drugs before completing his traffic stop." Appellant's Supp. Br. at 18.[6] He further argues there is no evidence in the record indicating that officer safety motivated Trooper Smith to ask Yeomans for consent to search the vehicle.

**DISCUSSION**

It is well established that a traffic stop is a seizure subject to the Fourth Amendment's limitations. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1257 (10th Cir. 2006). Accordingly, "[a] traffic stop is permissible under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred or is occurring." Id. at 1257-58 (further quotation omitted). "When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in

_____

[6]After initial briefing and oral argument of this case, we determined that supplemental briefing would be helpful. We accordingly ordered the parties to submit supplemental briefs.

-9-

the light most favorable to the government." Id. at 1258 (further quotation omitted). Furthermore, we must "accept the district court's factual findings unless [they] are clearly erroneous," while "[t]he ultimate determination of reasonableness . . . is a question of law reviewable de novo." Id. (further quotation omitted).[7] While his briefs and his notice of appeal are unclear on this point, to the extent Yeomans also appeals the denial of his motion for a new trial, we review that denial for an abuse of discretion. United States v. Gwathney, 465 F.3d 1133, 1144 (10th Cir. 2006). Similarly, "[w]e review the district court's denial of a motion for reconsideration for an abuse of discretion." United States v. Barajas-Chavez, 358 F.3d 1263, 1266 (10th Cir. 2004).

There is no dispute that Trooper Smith's initial stop of the car in which Yeomans was traveling was justified. However, we have stated that "the reasonableness of a traffic stop depends on both 'the length of the detention and the manner in which it is carried out.'" Alcaraz-Arellano, 441 F.3d at 1258 (quoting United States v. Holt, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc)).

---

[7]We have stated that "'unless a party asks the district court to reconsider its decision at trial, . . . we will not consider trial evidence which undermines a district court decision rendered at a pretrial suppression hearing.'" United States v. Humphrey, 208 F.3d 1190, 1203 (10th Cir. 2000) (quoting United States v. Parra, 2 F.3d 1058, 1065 (10th Cir. 1993)). Neither party indicates that such a request for reconsideration was made at trial, nor does anyone argue that there was or was not evidence at trial which undermined the district court's decision at the suppression hearing. Yeomans' motion post-trial for reconsideration of the denial of his motion to suppress was based upon the fact that, in the state court proceeding against Barley stemming from the same stop and arrest, the state court suppressed the evidence.

Yeomans argues the stop became unlawful when Smith asked him questions outside the scope of and unrelated to the purpose of the stop. In particular, he asserts that the Fourth Amendment was violated "when [Trooper Smith] request[ed] to search [the] vehicle for illegal drugs, without completing the traffic stop and without any articulable suspicion or probable cause of criminal activity because it impermissibly extends the duration and permissible scope of the traffic stop." Appellant's Supp. Br. at 13.

Several rules guide our analysis in this case. First, "[t]his court 'follow[s] the bright-line rule that an encounter initiated by a traffic stop *may not* be deemed consensual unless the driver's documents have been returned to [him.].'" United States v. Guerrero-Espinoza, 462 F.3d 1302, 1308-09 (10th Cir. 2006) (quoting United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005) (further quotation, alteration omitted; emphasis added)). In this case, since Trooper Smith never handed back the driver's license and other materials he had obtained from the driver, Steven Barley, prior to Yeomans' arrest, the encounter never became consensual.[8] Thus, when the questioning about drugs occurred, and when

_____

[8]We have recently indicated that the analysis of when the detention is over may differ for the driver and for the passenger, at least if the passenger is the owner, depending upon what a reasonable person in the particular position of the driver or passenger/owner might know or perceive. See Guerrero-Espinoza, 462 F.3d at 1309-11. In Guerrero-Espinoza, we drew this distinction in part because the driver and the passenger/owner were physically in slightly different places— the driver was sitting in the officer's patrol car, while the passenger/owner remained in the stopped vehicle. We held that the passenger/owner had no reason

(continued...)

-11-

Yeomans and Barley consented to a search of their car, the traffic stop continued to be a detention, not a consensual encounter.

As indicated, our cases have stated that both the duration and the scope of a traffic stop are relevant to determining its legality. Yeomans argues that Trooper Smith impermissibly expanded the scope of the stop, which was initially based upon exceeding the speed limit, when he asked about drugs. We have always held that it is "reasonable for an officer to ask questions about the motorists's travel plans and authority to operate the vehicle." Alcaraz-Arellano, 441 F.3d at 1258. More recently, however, we recognized that, in light of recent Supreme Court authority, Muehler v. Mena, 544 U.S. 93 (2005), "'[a]s long as the [officer's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions." Alcaraz-Arellano, 441 F.3d at 1258 (quoting United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005)). There was nothing improper, therefore, in questioning Yeomans and Barley about drugs, so long as that questioning did not unreasonably extend the length of the detention.

_____

[8](...continued)
to know that the traffic stop had ended vis-a-vis the driver when the driver, while sitting in the patrol car, was given his license and registration materials and told he could leave, but in fact remained outside the detained vehicle. Here, by contrast, since Barley and Yeomans remained together in the detained vehicle until removed by the troopers, their reasonable perception of what was happening, including their awareness of the fact that Barley's license and registration materials had not been returned, would have been the same.

On that issue, it does not appear that the questioning about drugs extended the length of the detention. Rather, it appears that, to the extent the detention was prolonged at all, it was because Trooper Smith and Deputy Burke were mulling over the significance, if any, of the fact that Yeomans appeared not to know the last name of his nephew.[9] We therefore conclude that questioning about drugs did not unreasonably extend the detention, and therefore did not violate the Fourth Amendment. See id. at 1259 ("'A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed.'") (quoting United States v. Martin, 422 F.3d 597, 601-02 (7th Cir. 2005)).

Furthermore, the government argues in its supplemental brief that the detention and search of Yeomans and the Jeep were justified on the ground of officer safety. We agree. When the officers stopped the car, they knew that Yeomans, who was the subject of two restraining orders possibly involving domestic violence, could be an occupant of the car. As they first approached the

---

[9]Trooper Smith testified that "the normal course of filling in all the blanks" on a speeding citation required approximately ten minutes. Tr. of Mots. Hr'g at 84, Appellant's App. at 92. He also testified that approximately six minutes elapsed between the time he stopped the Jeep and the time he sat down in his patrol car to begin writing out the speeding citation. Since Yeomans was handcuffed and arrested approximately eighteen minutes after the initial stop, we can infer that there was a delay of two minutes from the normal time it would take to stop a car, obtain information from the driver and write out a citation.

car, they observed the guns and ammunition in the vehicle. At some point prior to asking Yeomans and Barley to exit the vehicle, and prior to the subsequent pat-down of Yeomans and search of the car, they learned that Yeomans owned the weapons. That combination of information more than justified their actions in removing Yeomans and Barley from the vehicle, patting them both down and searching the car. "Officers can conduct a protective search of a vehicle's passenger compartment for weapons during an investigative detention when officers have a reasonable belief that a suspect poses danger." United States v. Dennison, 410 F.3d 1203, 1210 (10th Cir. 2005). Additionally, "an officer making a traffic stop may order both the driver and passengers to exit the vehicle pending completion of the stop." Id. at 1211 (citing Maryland v. Wilson, 519 U.S. 408, 414-15 (1997)). "A police officer may also 'perform a "patdown" of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.'" Id. (quoting Knowles v. Iowa, 525 U.S. 113, 118 (1998)). Trooper Smith and Deputy Burke were accordingly entitled to ask Yeomans and Barley to get out of the vehicle, pat them down and search the interior of the car.[10] The pat-

_____

[10]The government argues in its supplemental brief that, at the time the officers asked Yeomans and Barley to exit the car and submit to a pat-down, the officers actually had probable cause to arrest Yeomans for a violation of 18 U.S.C. § 922(g)(8)(B), which prohibits a person subject to a restraining order involving domestic abuse from possessing a gun. The government bases this argument on the fact that the officers: (1) knew who Yeomans was, since he had provided them with some form of identification; (2) knew he was subject to two restraining orders involving a boy and a woman which they suspected related to

(continued...)

-14-

down in turn led to the discovery of the contraband on Yeomans' person, which, in turn, indisputably provided probable cause to arrest Yeomans. A thorough search of the car, as well as a further search of Yeomans' person at the jail, inevitably and properly followed.

Yeomans responds that there was no evidence the officers were in fact fearful for their safety. That is irrelevant. "This court . . . has reasoned that the test of officer safety is objective rather than subjective, and therefore the officer need not personally be in fear." Id. at 1213. Further, we have "emphasize[d] . . . that the balance [between the government's interest in officer safety and the motorist's interest in privacy] does not depend on whether the officer subjectively fears the motorist." United States v. Holt, 264 F.3d 1215, 1225 (10th Cir. 2001) (en banc). "That one officer is braver (or more foolhardy) than another, and therefore not subjectively concerned for his or her safety, should not deprive that particular officer of a right to protect his or her safety." Id. at 1225-26. Thus, the fact that the officers did not testify to being fearful for their safety does not prohibit them from acting in accordance with what a reasonable officer would

_____

[10](...continued)
domestic abuse, and (3) knew that Yeomans owned the weapons, because he had already volunteered that the weapons in plain view in the car were his and that he was transporting them to his residence. We need not address this issue because, as we conclude above, even without probable cause prior to the pat-down, the officers were entitled to remove Yeomans from the car and pat him down, which led to the discovery of contraband on his person, which in turn gave the officers probable cause to arrest him.

-15-

objectively feel justified in doing once he observed guns and ammunition in a car stopped for speeding, in which a person subject to restraining orders is riding. See United States v. Neff, 300 F.3d 1217, 1222 (10th Cir. 2002) (rejecting defendant's argument that no grounds for a Terry frisk existed "because there was no evidence in the record that the officers in fact feared for their safety.").

Additionally, the officers were not obligated to conduct their investigation in any particular order, and the fact that they did not immediately react to the presence of weapons, or immediately frisk or arrest Yeomans, is irrelevant. Just as there is "no constitutional right to be arrested," there is no constitutional right to be arrested at a particular time. Hoffa v. United States, 385 U.S. 293, 310 (1966); United States v. Wynne, 993 F.2d 760, 765 (10th Cir. 1993) ("'The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect.'" (quoting Hoffa, 385 U.S. at 310)).

We accordingly conclude that the district court correctly denied Yeomans' motion to suppress. The court also did not abuse its discretion in denying Yeomans' motion for a new trial and his motion to reconsider the denial of his motion to suppress.[11]

---

[11]Yeomans only develops an argument about the propriety of the district court's denial of his motion to suppress. Because he develops no argument concerning the denial of his motion for a new trial, nor does he make any argument about the specific ground upon which he sought reconsideration of the denial of his motion to suppress, we conclude that he has failed to show that the district court abused its discretion in denying those motions.

## CONCLUSION

For the foregoing reasons, the conviction is AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge