**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 2, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JESUS GOMEZ-ARZATE,

    Defendant - Appellant.

No. 19-2119

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GUILLERMO MARTINEZ-TORRES,

    Defendant - Appellant.

No. 19-2121

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. 1:18-CR-01960-WJ-2 and 1:18-CR-01960-WJ-1)**
_____

Sylvia Baiz, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant Martinez-Torres; and Michael Garey, Santa Ana, California for Defendant-Appellant Gomez-Arzate.

Nicholas Ganjei, Assistant United States Attorney (and John C. Anderson, United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.
_____

Before **LUCERO**, **KELLY**, and **BACHARACH**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Defendant-Appellants Guillermo Martinez-Torres and Jesus Gomez-Arzate entered a conditional plea of guilty to conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846, 841(b)(1)(A), reserving a right to appeal the district court's denial of their motions to suppress physical evidence and statements made during a traffic stop. See United States v. Martinez-Torres, No. 1:18-cr-1960 WJ-1, 2019 WL 113729 (D.N.M. Jan. 4, 2019). Each was sentenced to 63 months' imprisonment and five years of supervised release. On appeal, they contend that their initial traffic stop was invalid, the resulting detention was unlawfully extended and without valid consent, and the deputies' search of their car exceeded the scope of consent.[1] We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

**Background**

On the morning of May 17, 2018, defendants were driving their vehicle (a Kia Soul) eastbound on I-40. Bernalillo County Sheriff's Deputy Joshua Mora was conducting routine traffic enforcement. He noticed the defendants' vehicle swerving within the right-hand lane and crossing over the white shoulder line twice. He also noticed that the front driver's side tire appeared to be angled or out of alignment.

---

[1] We grant Mr. Gomez-Arzate's unopposed motion to incorporate Mr. Martinez-Torres' arguments pursuant to Federal Rule of Appellate Procedure 28(i).

2

After pulling the vehicle over and activating his audio recorder, Deputy Mora approached the passenger side window where Mr. Gomez-Arzate was seated. He immediately sensed a strong odor of air freshener. He attempted to explain to the defendants why he pulled them over, but realized there would be difficulty in communicating due to a language barrier. Upon request, Mr. Martinez-Torres provided a California driver's license, a Texas vehicle registration in the name of a third party, and proof of insurance. Deputy Mora then asked Mr. Martinez-Torres to exit the vehicle and join him on the passenger side.

About three minutes into the stop, Deputy Mora radioed Deputy Daniel Mauricio for assistance in translating. While waiting for Deputy Mauricio, Deputy Mora began filling out a warning citation. Mr. Martinez-Torres explained that the misaligned tire was due to a previous accident, and he asked Deputy Mora if he wanted to know the "motive of [their] trip." 3 Aplt. Gomez-Arzate App. 335. However, Deputy Mora told Mr. Martinez-Torres to hold off until Deputy Mauricio arrived.

Approximately 10 minutes into the stop, Deputy Mauricio arrived and explained to Mr. Martinez-Torres that Deputy Mora had seen the vehicle swerve and there appeared to be a problem with the left front tire. Mr. Martinez-Torres explained that a bent wheel was due to a previous accident.

The deputies then asked Mr. Martinez-Torres for permission to check the vehicle's VIN numbers and Mr. Martinez-Torres replied that it was "okay." Id. at 339. This request occurred about 11 minutes into the stop and approximately one

3

minute after Deputy Mauricio arrived.  They also told Mr. Gomez-Arzate that they were going to check the VIN numbers, and he also said "okay."  Id. at 340.

While checking the VIN numbers, Deputy Mauricio asked Mr. Gomez-Arzate whether he could ask him some additional questions about his travel plans.  Mr. Gomez-Arzate said "[o]h, yes," id. at 340–41, and told the deputies that he and Mr. Martinez-Torres were traveling from California to Dalhart, Texas, then on to Dumas, Texas, both near Amarillo.  When asked who owned the vehicle, Mr. Gomez-Arzate responded that it belonged to a man in Dumas, Texas who let them borrow it.  They were travelling from California to Texas, staying three or four days to make a house habitable, and then returning with family.

About 15 minutes into the stop, the deputies told Mr. Martinez-Torres that they were going to give him back his documents as well as a warning citation for careless driving, N.M. Stat. § 66-8-114, and that he would not have to go to court or pay anything.  Mr. Martinez-Torres signed the citation approximately 16 minutes into the stop.

As Mr. Martinez-Torres began walking back to his vehicle, Deputy Mora yelled to him, "Guillermo!"  Id. at 346.  When he walked back, the deputies asked, "do you understand you're free to go?  But we wanted to ask you some more questions, if that's okay."  Id.  And again, "[d]o you – do you understand that you are – you are free to go?"  Id.  Mr. Martinez-Torres responded "[y]es."  Id.

The deputies began asking him questions about their travel plans.  Mr. Martinez-Torres told the deputies that they were travelling from Santa Ana,

4

California, to Amarillo, Texas. He and Mr. Gomez-Arzate were going for three or four days to see a house and visit friends. But, Mr. Martinez-Torres said that he did not know the name of the person they planned to visit. When asked who owned the vehicle, Mr. Martinez-Torres said that it was Mr. Gomez-Arzate's, and that they had picked it up in Amarillo and driven to California.

The deputies then returned to the vehicle to talk to Mr. Gomez-Arzate. They told him that they gave Mr. Martinez-Torres a warning and said, "we told him that he's free to go, and we're going to ask you more questions. Do you understand you're free to go? But we wanted to ask you some more questions, if that's fine with you." Id. at 353. Mr. Gomez-Arzate said that he understood and that it was no problem. Mr. Gomez-Arzate proceeded to reiterate their travel plans: they were going to Dumas, Dalhart, and Hartley, Texas, where there was a cattle ranch and they planned to clean a house. He obtained the vehicle from the ranch when his truck broke down. When asked the name of the owner of the vehicle, Mr. Gomez-Arzate said that he did not know the owner's name but knew the owner's friend, whose name was Jackie or Ezequiel.

The deputies turned back to Mr. Martinez-Torres and asked if he was responsible for everything in the vehicle. He claimed responsibility for only his clothes and bookbag. He denied having any drugs, weapons, or large bulk currency. The deputies then asked if they could search the car, but Mr. Martinez-Torres' response was inaudible on the recording.

5

While Mr. Martinez-Torres waited, Mr. Gomez-Arzate claimed responsibility for his bag and a cooler and also denied that the vehicle contained any drugs, weapons, or large bulk currency. Finally, the deputies asked him, "[c]an we check the car and your – your things?" Id. at 367. Mr. Gomez-Arzate responded, "[y]es, you can check." Id.

The deputies provided each of the men with a Spanish consent-to-search form, which they signed. The deputies asked the men to stand about 25–50 yards away while they searched the vehicle and told Mr. Martinez-Torres that he was free to call his daughter. At this point the audio recording concluded, approximately 33 minutes after the initial stop, and the deputies began their search of the car.

During the search, they noticed that the car's fender was not flush, so they removed it but later reattached it. One of the defendants even offered to assist with reattaching the fender. The deputies also removed the air filter, but nothing else was done to the engine. Finally, Deputy Mora noticed tooling marks on the right rear quarter panel, so he pulled back the panel slightly and discovered a circular void. He removed the panel and discovered two packages, wrapped in black tape. The packages contained approximately seven pounds of methamphetamine. The entire search of the vehicle lasted a total of 90 minutes.

**Discussion**

When reviewing a district court's denial of a motion to suppress, we review findings of fact for clear error, and view the evidence in the light most favorable to

6

the government. <u>United States v. Hernandez</u>, 847 F.3d 1257, 1263 (10th Cir. 2017).

We review de novo the determination of whether the search and seizure were

reasonable under the Fourth Amendment. <u>Id.</u>

### A. Fourth Amendment

We first consider whether the traffic stop was invalid, whether the stop was

unconstitutionally prolonged, and whether the deputies' search of the car exceeded

the scope of consent. The Fourth Amendment provides: "[t]he right of the people to

be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A traffic stop

constitutes a "seizure" and "therefore must be conducted in accordance with the

Fourth Amendment." <u>Heien v. North Carolina</u>, 574 U.S. 54, 60 (2014).

### a. Initial Justification for the Traffic Stop

At the outset, Mr. Gomez-Arzate and Mr. Martinez-Torres argue that the initial

traffic stop was not justified, claiming that Deputy Mora did not have reasonable

suspicion to initiate the traffic stop. The district court concluded that, by swerving

within his lane and twice touching the solid white line, there was reasonable

suspicion that Mr. Martinez-Torres violated two driving laws: New Mexico Statutes

§ 66-7-317(A) (driving on roadways laned for traffic) and § 66-8-114 (careless

driving). <u>Martinez-Torres</u>, 2019 WL 113729, at *4–5. We agree that there was

reasonable suspicion that Mr. Martinez-Torres violated the roadways-laned-for-

traffic statute, and we need not address the other.

7

A traffic stop is reasonable if it is "justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." United States v. Mayville, 955 F.3d 825, 829 (10th Cir. 2020) (quoting United States v. Cone, 868 F.3d 1150, 1152 (10th Cir. 2017)). A traffic stop is justified when the officer has "reasonable suspicion — that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." Heien, 574 U.S. at 60.

New Mexico law provides that "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." N.M. Stat. Ann. § 66-7-317(A) (1978). Defendants contend that the initial stop was not justified by reasonable suspicion because, even if the car had touched the solid white line twice, Mr. Martinez-Torres had not violated § 66-7-317(A). In determining whether a violation occurs, New Mexico courts have adopted a totality of the circumstances approach that "takes into account whether there were any weather conditions, road features, or other circumstances that could have affected or interfered with a driver's ability to keep his or her vehicle in a single lane." State v. Siqueiros-Valenzuela, 404 P.3d 782, 787 (N.M. Ct. App. 2017). Here, the district court credited Deputy Mora's account of the vehicle swerving and straddling the solid white line two times. See Martinez-Torres, 2019 WL 113729, at *5. Given that there were no additional circumstances — such as adverse weather conditions or

8

obstructions in the road, id. — it was objectively reasonable for Deputy Mora to conclude that Mr. Martinez-Torres violated § 66-7-317(A).

### b. Deputies' Conduct During the Traffic Stop

We turn next to the defendants' argument that the deputies unreasonably prolonged the detention by asking questions related to their travel plans and checking the car's VIN number. This argument turns on "whether the stop's 'manner of execution unreasonably infringe[d]' upon Defendant's Fourth Amendment rights." United States v. Mayville, 955 F.3d 825, 829 (10th Cir. 2020) (alteration in original) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

The length of a traffic stop is analyzed in the context of the stop's "mission," which covers "address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." Rodriguez v. United States, 575 U.S. 348, 354 (2015) (citation omitted). The deputies' authority to seize the vehicle's occupants "ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." Id. A traffic stop cannot be constitutionally prolonged unless "(1) the seized individual consents or (2) the officer has independent reasonable suspicion of criminal wrongdoing on behalf of the seized individual that justifies further investigation." United States v. Cortez, 965 F.3d 827, 833 (10th Cir. 2020).

A traffic stop's "mission" includes determining whether to issue a ticket and "ordinary inquiries incident to [the traffic] stop." Rodriguez, 575 U.S. at 355. These types of inquiries will include "checking the driver's license, determining whether

9

there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. Furthermore, officers may take "negligibly burdensome precautions" in order to ensure their own safety during the stop. Id. at 356. Merely because officers could have possibly performed their task more quickly, does not, by itself, create a Fourth Amendment violation. Cortez, 965 F.3d at 837–38.

The district court broke the traffic stop into three segments. Minutes 0 to 11 occurred when Deputy Mora pulled over the vehicle, radioed Deputy Mauricio, and the officers explained to Mr. Martinez-Torres the reason he was pulled over. Minutes 11 to 16 involved the deputies checking the VIN numbers on the car, asking the defendants about their travel plans, and issuing Mr. Martinez-Torres the warning citation. Finally, minutes 16 to 33 of the stop involved further questioning about the defendants' travel plans and concluding with signed consent-to-search forms.

### i. Minutes 0 to 11

The first 11 minutes of the traffic stop were conducted in a constitutionally valid manner. Although Deputy Mora was able to obtain Mr. Martinez-Torres' driver's license, the car registration, and proof of insurance, he believed it was prudent to have a translator to facilitate communication.[2] This decision was entirely reasonable and did not impermissibly extend the stop. See United States v. Martinez,

---

[2] Counsel for Mr. Gomez-Arzate conceded during oral arguments that Deputy Mora could call Deputy Mauricio in order to translate. See Oral Argument at 14:00, United States v. Martinez-Torres, Nos. 19-2119, 19-2121 (10th Cir. argued Sept. 24, 2020), https://www.ca10.uscourts.gov/oralarguments/19/19-2121.mp3.

983 F.2d 968, 976 (10th Cir. 1992) (stating that the circumstances of the traffic stop justified calling a Spanish-speaking officer to assist in questioning); see also United States v. Ruiz, 412 F.3d 871, 880 (8th Cir. 2005) (concluding that a stop that was extended 10 minutes so a Spanish-speaking officer could arrive was reasonable in scope and duration).  Indeed, within the first minute of Deputy Mauricio arriving, he was able to explain to Mr. Martinez-Torres why he was pulled over, and Mr. Martinez-Torres was able to explain the reason his front tire appeared out of place.  Thus, the first 11 minutes of the traffic stop — most of which was spent waiting for Deputy Mauricio — did not violate the Fourth Amendment.

### ii.  Minutes 11 to 16

What occurred after the first 11 minutes forms much of the basis of defendants' objections.  During this five-minute interval, the deputies asked Mr. Martinez-Torres and Mr. Gomez-Arzate whether they could check the VIN numbers.  After Mr. Martinez-Torres said it was okay, Deputy Mauricio asked Mr. Gomez-Arzate whether the deputies could ask him some questions about their travel plans.  Mr. Gomez-Arzate said, "[o]h, yes."  3 Aplt. Gomez-Arzate App. 340–41.  This questioning lasted about three minutes, at which time the deputies returned to Mr. Martinez-Torres to explain and issue the warning citation.

The defendants object to the VIN check and additional questions about their travel plans.  They argue that the citation had already been written and explained 11 minutes in, such that the traffic stop had effectively been completed.  The district court rejected the defendants' arguments concluding that questions about travel plans

11

and VIN searches are within the scope of a traffic stop and were permissible.

Martinez-Torres, 2019 WL 113729, at *5–7.  We disagree because in this particular

case the traffic stop had effectively been completed once Deputy Mora had

completed the paperwork and Deputy Mauricio had translated the paperwork to Mr.

Martinez-Torres.[3]  As a result, the traffic stop was improperly  prolonged from

minutes 11 to 16.  See Rodriguez, 575 U.S. at 354 ("Authority for the seizure thus

ends when tasks tied to the traffic infraction are — or reasonably should have been

— completed.").

　　However, this does not automatically mean the evidence should be suppressed.

"Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful

search is *at least* the but-for cause of its discovery."  United States v. Chavira, 467

F.3d 1286, 1291 (10th Cir. 2006).  A "but-for cause" is understood as the "factual

nexus between the illegality and the challenged evidence."  Id. (quoting United States

---

[3] With that said, the district court appears correct in its assessment that VIN
searches and questions about travel plans can ordinarily be within the scope of a
traffic stop.  See, e.g., New York v. Class, 475 U.S. 106, 115 (1986) ("[A] demand to
inspect the VIN, like a demand to see license and registration papers, is within the
scope of police authority pursuant to a traffic violation stop."); United States v.
Moore, 795 F.3d 1224, 1229 (10th Cir. 2015) ("An officer may also generally inquire
about the driver's travel plans and ask questions . . . .") (citation omitted); United
States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly
held (as have other circuits) that questions relating to a driver's travel plans
ordinarily fall within the scope of a traffic stop."); see also United States v. Chavira,
467 F.3d 1286, 1289 n.1 (10th Cir. 2006) (explaining that there is no unlawful
detention when the officer remains physically outside the car when examining the
VIN).  Here, though, the traffic stop had effectively been completed before the VIN
search and questioning about travel plans.

12

v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000)). In Chavira, we held that there was no but-for causation because the unlawful VIN search "uncovered no contraband" and there was no connection between the cell phone officers discovered and the subsequent search. Id. at 1291–92. We also concluded that there was "no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb." Id. at 1292.

As in Chavira, there is no indication that Deputy Mora would not have requested (and obtained) consent to ask defendants additional questions. Deputy Mora testified that he had harbored suspicions from the outset of the stop based upon discrepancies in the driver's documents, the overwhelming smell of air freshener, and the fact that defendants were travelling along a common contraband trafficking route. In contrast, he obtained largely innocuous information while performing the VIN search and briefly questioning Mr. Gomez-Arzate. It seems likely that Deputy Mora would have asked for consent to ask additional questions based on his initial suspicions even without the information he gleaned during minutes 11 to 16.

Moreover, we conclude that both defendants would have given voluntary consent for additional questioning regardless of what occurred during minutes 11 to 16. As the district court found, "[e]ach time the Deputies requested permission to do something, Defendants freely gave consent." Martinez-Torres, 2019 WL 113729, at *12. Early on, Mr. Martinez-Torres asked Deputy Mora if he wanted to know the motive of the trip. There is no evidence suggesting coercion — the encounter was pleasant and cordial from start to finish. The defendants have simply failed to show

13

that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." Chavira, 467 F.3d at 1291 (quoting Nava-Ramirez, 210 F.3d at 1131).

### iii.  Minutes 16 to 33

Next, we turn to what occurred after Deputy Mora returned Mr. Martinez-Torres' documents and issued him a warning citation for careless driving. After issuing the citation, Mr. Martinez-Torres began walking back to the car when Deputy Mora turned around and yelled, "Guillermo!" 3 Aplt. Gomez-Arzate App. 346. Deputy Mora, through Deputy Mauricio, explained to Mr. Martinez-Torres that he was "free to go," but asked if he could ask him some additional questions. After confirming that Mr. Martinez-Torres understood that he was free to go, the deputies began asking questions about their travel plans and who owned the vehicle. The deputies also went to Mr. Gomez-Arzate, who was sitting in the passenger's seat of the car, and told him that they had issued Mr. Martinez-Torres a warning and that they told Mr. Martinez-Torres that he was free to go. The deputies then said to Mr. Gomez-Arzate, "[d]o you understand you're free to go?  But we wanted to ask you some more questions, if that's fine with you." Id. at 353. Mr. Gomez-Arzate responded that he understood and that it was no problem. At the conclusion of this additional questioning, both defendants signed a Spanish consent-to-search form.

Defendants contend that after the documents had been returned, the encounter did not become consensual and the deputies lacked reasonable suspicion that would warrant prolonging the stop. The district court concluded that Deputy Mora had

14

reasonable suspicion to continue the stop due to the smell of air freshener; discrepancies with the license, registration, and proof of insurance; and the route they were traveling along. Martinez-Torres, 2019 WL 113729, at *7–8. Furthermore, the district court concluded that reasonable suspicion grew due to the "implausible and inconsistent story" about the purpose of their travel, their explanations about who owned the car, and the defendants' apparent nervousness. Id. at *8. In the alternative, the district court held that after the traffic stop ended, there was a valid consensual encounter. Id. at *8–10. We agree with the district court and hold that the additional questioning during this time was pursuant to a consensual encounter.

As mentioned, once a traffic stop is completed, the driver must be allowed to leave unless "(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter." United States v. Bradford, 423 F.3d 1149, 1156–57 (10th Cir. 2005); see United States v. Harmon, 742 F.3d 451, 458–59 (10th Cir. 2014) ("An officer may continue questioning the driver if the stop has transitioned from a detention to a consensual encounter."). A traffic stop can turn into a consensual encounter, which does not require reasonable suspicion, when the driver consents to additional questioning. Bradford, 423 F.3d at 1158. However, a prerequisite for a consensual encounter is that the driver's documents are returned. Id.

The fundamental question we ask in these cases is whether "a reasonable person under the circumstances would believe [he] was free to leave or disregard the

15

officer's request for information." Id. (quoting United States v. Elliot, 107 F.3d 810, 814 (10th Cir. 1997)). We follow a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter, recognizing that merely handing back documents is not "always sufficient to demonstrate that an encounter has become consensual." Id. Factors that we have found relevant to our analysis include:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005) (quoting United States v. Zapata, 997 F.2d 751, 756–57 (10th Cir. 1993)). While this list is not exclusive and no one factor is dispositive, we focus on "the coercive effect of police conduct, taken as a whole on a reasonable person." Id.

Once Deputy Mora returned Mr. Martinez-Torres' paperwork, the traffic stop turned into a consensual encounter. The district court found that the deputies did not brandish their weapons, they were conversational in tone, there were only two or three deputies on the scene — none of which were positioned in a coercive manner, and it occurred in daylight and in public view. Martinez-Torres, 2019 WL 113729, at *9.

16

As it relates to Mr. Martinez-Torres, who was standing outside of the car talking with the deputies, he was specifically asked twice whether he understood that he was free to go. Mr. Martinez-Torres responded, "yes." See Spence, 397 F.3d at 1283 (stating that a relevant factor is "whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent"); United States v. Sandoval, 29 F.3d 537, 544 (10th Cir. 1994) (considering "whether the driver was informed of his right to refuse consent or to proceed on his way" as an important factor). Moreover, the deputies allowed Mr. Martinez-Torres to call his daughter and make sure she was up for school, which bears on the officers' demeanor and whether the interaction was coercive.

Mr. Martinez-Torres further argues that by calling him back to the police car, Deputy Mora was making a show of authority. We do not agree. The district court found that the officers were "polite and pleasant" and "did not convey an overbearing show of authority." Martinez-Torres, 2019 WL 113729, at *9. Merely calling out Mr. Martinez-Torres' name to ask whether he would be willing to answer additional questions does not preclude finding a consensual encounter. Cf. United States v. Villegas, 554 F.3d 894, 899 (10th Cir. 2009) (finding that consent was not involuntary simply because consent was solicited while the defendant had not completely exited the patrol car); Bradford, 423 F.3d at 1159 (finding that consent was not involuntary even though it was requested while the defendant was still in the patrol car). Thus, as to Mr. Martinez-Torres, this was a consensual encounter.

17

Mr. Gomez-Arzate, who was sitting in the passenger's seat of the car, also consented to the additional questioning and was not unlawfully detained. Although he was not the driver and therefore did not give the deputies any documents, he was informed that Mr. Martinez-Torres had received his documents and a warning citation, and that Mr. Martinez-Torres was free to leave. The deputies also informed Mr. Gomez-Arzate that he was free to leave but sought his permission to ask further questions. Like Mr. Martinez-Torres, Mr. Gomez-Arzate agreed to answer the deputies' questions. And again, there was no show of authority or coercion.

Mr. Gomez-Arzate asserts that he did not voluntarily consent because he was a passenger in the car and was not privy to the conversation between the deputies and Mr. Martinez-Torres. However, merely being the passenger of the car does not render his consent involuntary. Rather, we must consider whether Mr. Gomez-Arzate could reasonably "believe [he] was free to leave or disregard the officer's request for information." Bradford, 423 F.3d at 1158. Mr. Gomez-Arzate was informed of all the circumstances and was explicitly told that both he and Mr. Martinez-Torres were free to leave. Yet, Mr. Gomez-Arzate agreed to further questioning. Therefore, Mr. Gomez-Arzate's reliance on Guerrero-Espinoza is misplaced. In that case, we determined that the passenger could have reasonably believed he was not free to leave because he was not aware that the warning had been issued and it appeared that the driver continued to be detained. United States v. Guerrero-Espinoza, 462 F.3d 1302, 1309–10 (10th Cir. 2006); see also United States v. Yeomans, 211 F. App'x 753, 758 n.8 (10th Cir. 2007) (discussing Guerrero-Espinoza in the context of a case

18

where the driver and passenger remained together). Here, the deputies fully explained to Mr. Gomez-Arzate the circumstances of the stop and that both he and Mr. Martinez-Torres were free to go. Therefore, this was also a consensual encounter as to Mr. Gomez-Arzate.

Even though we conclude that this was a consensual encounter, we note that the deputies also had sufficient reasonable suspicion to justify the extension of the traffic stop. When Deputy Mora first approached the car, he noticed the "overwhelming" scent of air freshener. The district court found that Deputy Mora knew from his training and experience that this was one method used to mask the smell of drugs. Next, he learned that Mr. Martinez-Torres had a California driver's license, but the car was registered in Texas to an absent third party. See United States v. Pettit, 785 F.3d 1374, 1382 (10th Cir. 2015) ("[I]n our case law, driving a vehicle registered to an absent third party can indicate drug trafficking."). Moreover, Mr. Martinez-Torres was listed on the insurance but not on the registration, creating an additional layer of confusion.

Then, once Deputy Mauricio arrived on the scene and the deputies were able to ask some questions about the defendants' travel plans, suspicion grew. When Mr. Gomez-Arzate was asked who owned the vehicle, he indicated that it was loaned to him, but he could not recall the person's name. However, when Mr. Martinez-Torres was asked who owned it, he said that it was Mr. Gomez-Arzate. This unusual story about who owned the car — especially when coupled with the fact that Mr. Martinez-Torres was listed on the insurance — only added to the deputies' reasonable

19

suspicion. The defendants' stories about what their plans were in Texas also did not help their cause. Pettit, 785 F.3d at 1381 ("We have consistently held that implausible travel plans can contribute to a reasonable suspicion."). They told the deputies that they were going to Texas to see a ranch and clean up a house, but neither knew the name of the owner of the ranch, or the "friends" they were going to stay with.

Although this questioning was under the umbrella of a consensual encounter, the totality of the circumstances created more than sufficient reasonable suspicion to justify the officer's additional questions.

### c. Consent to Search the Vehicle

The deputies finally obtained valid consent from both defendants to search the vehicle. As we have discussed, this traffic stop had transitioned into a consensual encounter, and there is no indication that the deputies had applied coercive measures. Thus, it is difficult to question the voluntariness of both defendants' consent to allow the deputies to search the vehicle. Both defendants were orally asked whether they would agree to allowing a search of the car, and further, they both signed a Spanish language consent-to-search form. See United States v. Warwick, 928 F.3d 939, 945 (10th Cir. 2019) ("A signed consent form indicates voluntary consent."). The deputies also ensured that the defendants could read and understand the consent form. The district court's conclusion that there was express and voluntary consent to search the car is amply supported by the record.

20

### d. Scope of the Vehicle Search

Mr. Martinez-Torres and Mr. Gomez-Arzate finally argue that the manner and duration of the deputies' search of the car exceeded the scope of consent. We review for clear error the question of whether a search exceeds the scope and duration of consent, "which turns on what a reasonable person would have understood to be the scope and duration of his consent under the circumstances." United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). While the consenting party can limit the scope of consent, absent such a limitation "[a] general grant of permission to search an automobile typically extends to the entire car." Id. Additionally, we will consider whether the deputies conducted the search of the car diligently. Id. at 1151.

As the district court highlighted, Mr. Martinez-Torres and Mr. Gomez-Arzate did not provide any limitations on the scope of the car nor did they object to the duration of the search. This lack of objection indicates that the defendants' consent was not confined by time or location. Id. Furthermore, the search lasted 90 minutes, which is in the realm of reasonable duration under our case law. See id. at 1151 n.1 (collecting cases).

Mr. Martinez-Torres and Mr. Gomez-Arzate also contend that the search exceeded the scope of consent by being especially intrusive. However, as indicated, the defendants' general consent to search the car undercuts that argument. We have allowed deputies searching a car under a grant of general consent to effect some dismantling, and minor damage "does not by itself render a search excessive." United States v. Mendoza, 817 F.3d 695, 701 (10th Cir. 2016); see United States v.

21

Marquez, 337 F.3d 1203, 1209 (10th Cir. 2003) (noting that many of our cases allow "an officer's partial dismantling of an automobile pursuant to a general consent to search when the suspect did not object"). Here, the district court found that the deputies removed the air filter, took items out of the trunk, and removed and replaced the fender. Deputy Mora removed a rear quarter panel after seeing tooling marks and noticing a void behind the panel. Otherwise, the district court determined that "[t]here [was] no evidence of any further dismantling of the car." Martinez-Torres, 2019 WL 113729, at *3 (quotations omitted). As with the duration of the search, this case is not beyond the realm of reasonable searches of the car, and again, the defendants never objected. Indeed, one of the defendants even offered to help replace the fender, further buttressing the district court's conclusion that the search was within the scope of consent.

Defendants rely on United States v. Osage to argue that the deputies took the car apart and effectively dismantled it, thus exceeding the scope of consent. In Osage, the court held that "before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search," the officer needs either explicit consent or another valid justification. United States v. Osage, 235 F.3d 518, 522 (10th Cir. 2000). Although the deputies may have removed parts of the car, there is no indication that they destroyed or rendered the car completely useless. Indeed, the deputies appear to have reattached the fender that was removed and replaced the air filter. While the rear quarter panel may not have been replaced, we do not think this was the "complete

22

and utter destruction or incapacitation" that was at issue in <u>Osage</u>. <u>Id.</u> at 521 n.2. The search was pursuant to consent and lawful.

AFFIRMED.