PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2862
_____

UNITED STATES OF AMERICA

v.

MAXIMO MATEO-MEDINA
a/k/a David Contreras
a/k/a Luis Nieves
a/k/a Joseph Robles,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-15-cr-00055-1
District Judge: The Honorable Gerald J. Pappert

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)

April 18, 2016

Before: McKEE, *Chief Judge*,[1] FUENTES, and ROTH,
*Circuit Judges*

(Filed: January 9, 2017)

_____

[1] Judge Theodore McKee concluded his term as Chief of the
United States Court of Appeals for the Third Circuit on
September 30, 2016. Judge Brooks Smith became Chief
Judge on October 1, 2016.

Brett G. Sweitzer, Esq.
Federal Community Defender
Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant*


Bernadette A. McKeon, Esq.
Clare P. Pozos, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

McKEE, *Chief Judge*

Maximo Mateo-Medina appeals his sentence of twelve months plus one day imprisonment for illegally reentering the United States, in violation of 8 U.S.C. § 1326(a) and (b)(1). Although Mateo-Medina pled guilty to the offense, he now appeals the sentence, arguing that the sentencing court violated his Due Process Clause rights by impermissibly considering, among other things, arrests that did not result in convictions. The Presentence Investigation Report (PSR) that disclosed those arrests did not contain any of the underlying conduct. For the reasons set forth below, we agree and we will therefore vacate the sentence that was imposed and remand for resentencing.

## I. Factual & Procedural Background

Mateo-Medina, a citizen of the Dominican Republic, was initially deported from the United States in December 2012 after being convicted of unlawfully obtaining a U.S. passport and serving a five-month sentence for that offense. Shortly after he was deported, his common law wife, Milagros Rasuk, a U.S. citizen with whom Mateo-Medina had been residing for fifteen years prior to his deportation, was diagnosed with terminal colon cancer. Rasuk had two adult children from a prior marriage, both of whom had become drug addicts, and one of whom, Miguel, resided with Mateo-Medina and Rasuk. Rasuk's oldest son, Risdael, who suffers from mental health issues, had his own child, Angel. No doubt because of Risdael's drug addiction, he abandoned Angel for all practical purposes, and Angel was raised by Mateo-Medina and Rasuk.

When Mateo-Medina received word that Rasuk had been diagnosed with terminal cancer, he returned to the United States to care for her during her final months of life. She died in February 2014.[2] Angel was no older than eleven when his grandmother, Rasuk, died. Mateo-Medina continued to care for Angel and became his sole caretaker following Rasuk's death.[3]

According to Mateo-Medina, Miguel's continued presence in the household became increasingly disruptive and problematic following Rasuk's death because of Miguel's involvement with drugs and alcohol. Mateo-Medina claims that when he (Mateo-Medina) attempted to intercede and confront Miguel about his behavior, Miguel reported Mateo-Medina to the immigration authorities, informed them of his illegal reentry, and kicked Mateo-Medina out of the home.

---

[2] Mateo-Medina's mother, who was also a United States citizen, died of lung cancer 10 months later.

[3] Angel's therapist credits Mateo-Medina with providing a "stable, reliable, loving environment," for Angel following Rasuk's death. Appellant's Br. at 6 (citing J.A. at 68).

3

Miguel's strategy apparently worked because Mateo-Medina was subsequently arrested and charged with illegal reentry. He thereafter pled guilty to one count of reentry after removal in violation of 8 U.S.C. § 1326(a) and (b)(2).

Mateo-Medina's PSR calculated his offense level at ten, and his criminal history category was II. This resulted in a recommended sentence of eight to fourteen months' imprisonment. The PSR noted that Mateo-Medina had two previous convictions, one for driving under the influence in 2000, and one for fraudulently applying for a United States passport in 2012. Mateo-Medina was arrested under a different alias each time. The PSR also noted that Mateo-Medina had "numerous" arrests that did not lead to conviction.[4] Aside from the arrests leading to his two convictions, Mateo-Medina had been arrested six other times. However, each of the charges involved in his arrests had been withdrawn or dismissed, except for one which lacked a recorded disposition. As we noted earlier, the PSR did not describe any of the underlying conduct purportedly leading to those arrests.

Mateo-Medina argued for a downward departure from the suggested eight to fourteen-month guideline range. The District Court did depart downward one level. The court adjusted Mateo-Medina's Guidelines range downward to six to twelve months' imprisonment based on an offense level of nine and a criminal history category of II. At the sentencing hearing, both the prosecutor and the defense argued for a sentence of time served, which would have been equivalent to roughly six months, or the lower end of the Guidelines range. In spite of this, the District Court sentenced Mateo-Medina to twelve months plus one day, followed by two years of supervised release.[5]

---

[4] PSR at ¶ 6.

[5] While this sentence was technically an upward variance from the Guidelines range of six to 12 months, the sentencing court explained that imposing a sentence greater than one year would make Mateo-Medina eligible for "good time credit" which could reduce his term of imprisonment by 54 days (15%). 18 U.S.C. § 3624(b)(1).

In calculating Mateo-Medina's sentence, the District Court relied on the relevant factors in 18 U.S.C. § 3553(a) and information contained in the PSR. Significantly, the District Court also relied in part on Mateo-Medina's record of arrests that did not lead to conviction. The court explained:

> I also *cannot overlook the defendant's rather extensive* and I think we all have our own barometer of what is extensive versus what is not extensive *interaction with the criminal justice system*. But there were as I counted, I believe seven arrests, two convictions in three states since 1988. So, the defendant who was in this country initially illegally since at least the 80s has engaged in conduct which to the Court's view belied and made ring hollow a little bit his desire to merely come to America to seek a better life.[6]

## II. Standard of Review[7]

As a threshold matter, the parties disagree on the applicable standard of review. The Government argues that, because Mateo-Medina's objection to the District Court's statement regarding the defendant's prior arrest record was not preserved at sentencing, it is reviewed for plain error.[8] Under that standard, Mateo-Medina would bear the burden of establishing the District Court committed plain error.[9] This, the Government urges, Mateo-Medina has failed to do because, even if he could show plain error, he cannot show that it affected the outcome of the proceedings.

---

[6] J.A. at 115 (emphasis added).

[7] We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[8] Gov't Br. at 12; *see also United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc); *United States v. Couch*, 291 F.3d 251, 252-54 (3d Cir. 2002).

[9] *Johnson v. United States*, 520 U.S. 461, 467 (1997).

Mateo-Medina counters that he did indeed preserve the issue, and review should therefore be plenary.[10]  Mateo-Medina points out that counsel objected to the inclusion of the arrest record in the PSR and at the sentencing hearing.  He claims that the District Court understood the objection as an attempt to exclude the arrests as a sentencing consideration, and overruled it based on the court's (erroneous) view that arrests are "appropriate for the Court to consider [] under the statutory [sentencing] factors."[11]  Thus, in response to a defense objection, the District Court expressly ruled on the exact issue Mateo-Medina raises on appeal.  Mateo-Medina argues that this amounts to preservation, not forfeiture.  We need not address whether Mateo-Medina preserved his objection at sentencing because our precedent clearly demonstrates that a district court's consideration, even in part, of a bare arrest record is plain error.[12]

## III. Discussion

### A. Error

Our review of a criminal sentence "proceeds in two stages."[13]  First, we review for procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a  sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."[14]  Under the plain error standard, a defendant must show: (1) error, (2) that is plain or obvious, and (3) that affects a defendant's substantial rights.[15]  "If all three conditions are met, an appellate court may then exercise

---

[10] Appellant's Br. at 3, 12 n.7.

[11] J.A. at 100.

[12] *See United States v. Berry*, 553 F.3d 273, 281-84 (3d Cir. 2009).

[13] *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).

[14] *Gall v. United States*, 552 U.S. 38, 51 (2007).

[15] *United States v. Goodson*, 544 F.3d 529, 539 (3d Cir. 2008) (citations omitted).

its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."[16]  If we find procedural error "our preferred course is to remand the case for re-sentencing, without going any further."[17]  In the absence of procedural error, we will then determine whether the sentence imposed was substantively reasonable.  When reviewing for substantive reasonableness, "we will affirm [the sentence] unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided."[18]

Mateo-Medina relies on our opinion in *United States v. Berry*[19] to argue that the District Court plainly erred in considering his bare record of arrests not leading to conviction when imposing his sentence.  There, the sentencing judge considered the relevant factors under 18 U.S.C. § 3553(a) but also speculated about the reasons why the defendants' robbery charges had been nol prossed.  In the process, the prosecutor misread the PSR regarding Berry's bald arrest record.[20]

The sentencing judge also inflated the defendant's propensity for crime by speculating that it was "rather obvious that the reason he doesn't have any actual adult convictions is because of the breakdowns in the court—in the

---

[16] *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (citation omitted)).

[17] *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) (citation omitted).  However, on rare occasions, we have chosen to proceed to the second step of the analysis, substantive reasonableness, despite finding procedural error. *See United States v. Lychock,* 578 F.3d 214, 219-20 (3d Cir. 2009).  We find *Lychock* to be the exception rather than the rule, as that case concerned a defendant who was found guilty of possessing over 150 images of child pornography, but who received no jail term at sentencing, and where the district court provided no reasonable rationale for its actions.

[18] *Tomko*, 562 F.3d at 568.

[19] 553 F.3d 273 (3d Cir. 2009).

[20] *Berry*, 553 F.3d at 277.

state court system—and not because of innocence."[21]   The court also considered appropriate factors under Section 3553(a) such as the seriousness of the crimes of conviction. However, in imposing the sentence on Berry and his codefendant, the court explained:

> Taking all those factors in to account, given the fact that their criminal points . . . I don't think reflect quite adequately, the seriousness of their criminal exposure in the past. The fact that they were charged with crimes and then, the prosecution was dropped because nobody showed up to prosecute or something like that, means that their criminal history points were probably understated.[22]

Berry appealed, arguing that the district court should not have considered, even in part, his bald arrest record, when those arrests did not lead to a conviction.  He also argued that the sentencing court erred in speculating about why some prior charges were nol prossed and assuming he was guilty of offenses that were dismissed.  Because neither Berry nor his codefendant objected during sentencing, we reviewed for plain error.[23]   We specifically noted as a threshold matter "that resentencing would be required here even without the district court's speculation about the reasons for prior charges being nol prossed because of the misstatement of the defendant's arrest record and the district court's misreading of the PSRs."[24]  Further, we explained:

> A defendant cannot be deprived of liberty based upon mere speculation. We therefore follow the reasoning of the majority of our sister appellate courts and hold that a bare arrest record—without more—does not justify an assumption that a defendant has

---

[21] *Id*.

[22] *Id.* at 279.

[23] 553 F.3d at 279.

[24] *Id*. at 280.

8

committed other crimes and it therefore cannot support increasing his/her sentence in the absence of adequate proof of criminal activity.[25]

Here, the District Court also not only considered but misstated Mateo-Medina's prior arrests.[26] While the District Court considered a host of relevant factors under Section 3553(a), it also erroneously and puzzlingly relied on his misstated bald arrest record, stating:

> I also cannot overlook the defendant's rather extensive and I think we all have our own barometer of what is extensive versus what is not extensive interaction with the criminal justice system. But there were as I counted, I believe seven arrests [**actually six**], two convictions in three states since 1988.[27]

The Government argues that these statements indicate only the District Court's doubt as to Mateo-Medina's credibility in stating his reasons to return to the United States, not his criminal nature, a point that the government terms the "crucial" distinguishing factor between *Berry* and this case.[28] However, Mateo-Medina had only two convictions in the United States since 1988; one was a fifteen-year-old DUI, and

---

[25] *Id.* at 284.

[26] Although 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted for an offense which a court in the United States may receive and consider for the purpose of imposing an appropriate sentence," such information must be reliable. *See Berry*, 553 F.3d at 279-80 (explaining that facts considered at sentencing must be proved by preponderance of the evidence to satisfy requirements of Due Process Clause). As explained more fully herein, the bare arrest record relied on by the District Court in this case does not meet this requirement of reliability.

[27] J.A. at 115.

[28] Gov't Br. at 17.

the other was for the passport violation for which he was deported in 2012. It strains credulity to argue, as the Government does, that the sentencing court was referring only to these two convictions as an extensive interaction with the criminal justice system.

Accordingly, we conclude that, given our holding in *Berry*, the District Court's consideration of Mateo-Medina's record of prior arrests that did not lead to conviction was plain error under the circumstances here.

The Government next argues that:

> It was certainly not unreasonable for the district court to consider that persons genuinely occupied with the care of a terminally ill relative and a child typically do not have numerous interactions with the criminal justice system.[29]

This argument is both irrelevant and illogical. It assumes that one in Mateo-Medina's circumstance who is caring for a terminally ill relative does not venture outside the confines of the home—a nonsensical proposition. It also ignores the rationale that we clearly explained in *Berry:*

> [R]eliance on arrest records may also exacerbate sentencing disparities arising from economic, social and/or racial factors. For example, officers in affluent neighborhoods may be very reluctant to arrest someone for behavior that would readily cause an officer in the proverbial "high crime" neighborhood to make an arrest. A record of a prior arrest may, therefore, be as suggestive of a defendant's

---

[29] Gov't Br. at 19.

10

demographics as his/her potential for recidivism or his/her past criminality.[30]

Since we wrote *Berry,* substantial research and commentary has only reinforced the regrettable circumstances that we emphasized in disallowing consideration of bare arrest records at sentencing. In 2013, The Sentencing Project released a shadow report to the United Nations Human Rights Committee, *Regarding Racial Disparities in the United States Criminal Justice System* (Sentencing Project Report).[31] The Sentencing Project Report pointed to a wide body of scholarship indicating that socioeconomic factors influenced disparities in arrest rates.[32]

The Sentencing Project Report also remarked on recent research indicating that police are more likely to stop, and arrest, people of color due to implicit bias. Implicit bias, or stereotyping, consists of the unconscious assumptions that humans make about individuals, particularly in situations that

---

[30] *Berry*, 553 F.3d at 285 (citing Barbara Bennett Woodhouse, *Youthful Indiscretions: Culture, Class Status, and the Passage to Adulthood*, 51 DEPAUL L. REV. 743 (2002); Jane W. Gibson–Carpenter & James E. Carpenter, *Race, Poverty, and Justice: Looking Where the Streetlight Shines,* 3–SPG KAN. J.L. & PUB. POL'Y 99, 101 (1994) ("Police officers who have worked in many types of neighborhoods acknowledge that they call home to middle-class parents more readily. Between suburban and urban departments, the difference can be even more striking. A department of college-educated officers in a suburb of Minneapolis in the 1970s went so far as to invite parents and children into the station to discuss their problems confidentially, with virtual immunity from formal handling.")).

[31] The Sentencing Project, *Report of The Sentencing Project to the United Nations Human Rights Committee Regarding Racial Disparities in the United States Criminal Justice System* (August 2013), *available at* http://sentencingproject.org/wp-content/uploads/2015/12/Race-and-Justice-Shadow-Report-ICCPR.pdf (hereinafter Sentencing Project Report).

[32] Sentencing Project Report at 3.

require rapid decision-making, such as police encounters.[33] "Extensive research has shown that in such situations the vast majority of Americans of all races implicitly associate black Americans with adjectives such as 'dangerous,' 'aggressive,' 'violent,' and 'criminal.'"[34]

In addition, a recent empirical study analyzed thirteen years' worth of data on race, socioeconomic factors, drug use, and drug arrests.[35] The study found that African-Americans, Hispanics, and whites used drugs in roughly the same percentages, and in roughly the same ways.[36] The study controlled for variables such as whether the participant lived in high-crime, gang-controlled areas. Despite those controls, the study concluded that "in early adulthood, race disparities in drug arrest[s] grew substantially; as early as age 22, African-Americans had 83% greater odds of a drug arrest than whites and at age 27 this disparity was 235%."[37] With respect to Hispanics, the study found that socioeconomic factors such as residing in an inner-city neighborhood accounted for much of the disparity in drug arrest rates.[38]

---

[33] *Id.* at 3-4.

[34] *Id.* at 4 (internal citations omitted).

[35] Ojmarrh Mitchell & Michael S. Caudy, *Examining Racial Disparities in Drug Arrests*, JUSTICE QUARTERLY (Jan. 2013), *available at* http://dx.doi.org/10.1080/07418825.2012.761721.

[36] *Id.* at 22 ("Contrary to popular explanations of racial disparities in drug arrest[s], this research found that the racial disparity in drug arrests between black and whites cannot be explained by race differences in the extent of drug offending, nor the nature of drug offending. In fact, in this sample, African-Americans (and Hispanics) were no more, and often less, likely to be involved in drug offending than whites. Further, while minorities were more likely to live in the kinds of neighborhoods with heavy police emphasis on drug control and living in such neighborhoods had a strong relationship to drug arrest; neighborhood context explained only a small portion of racial disparity in drug arrests between African-Americans and whites.")

[37] *Id.*

[38] *Id.*

Accordingly, we conclude here, as we did in *Berry*, that the District Court plainly erred when it considered Mateo-Medina's bare arrest record when imposing sentence.

## B. Substantial Rights

Having concluded that the sentencing court committed plain error in considering Mateo-Medina's record of prior arrests, we turn next to the question of whether the error violated Mateo-Medina's substantial rights. As explained in *United States v. Marcus*,[39] errors that violate substantial rights "[i]n the ordinary case" must be "'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial."[40]

Here, as we have explained, the sentencing court erroneously considered Mateo-Medina's bare arrest record when determining the length of his sentence. It did so in spite of the prosecution and defense counsel agreeing to a lighter sentence and in spite of Mateo-Medina's minimal record of only two prior convictions for nonviolent offenses since the 1980s. We realize that the sentencing court also referenced numerous other factors that were appropriate to consider in deciding upon Mateo-Medina's sentence. However, that is no more palliative here than it was in *Berry*. The District Court's determination of an appropriate sentence for Mateo-Medina was nevertheless influenced by the impermissible consideration of Mateo-Medina's arrest record. We think it highly unlikely that the court was thereafter able to unring the bell when considering the guidelines or the factors contained in Section 3553(a). As we said in *Berry,* "The guidelines are, after all, *purely advisory*, and unsupported speculation about a defendant's background is problematic whether it results in an upward departure, denial of a downward departure, or causes the sentencing court to evaluate the § 3553(a) factors with a jaundiced eye."[41] Here, for example, the sentencing

---

[39] 560 U.S. 258 (2010).

[40] *Id.* at 262 (citations omitted).

[41] 553 F.3d at 281 (citing *United States v. Booker*, 543 U.S. 220 (2005).

court stated that Mateo-Medina's prior interactions with the police made his statement that he came to the United States to seek a better life "ring hollow."[42] We therefore conclude that the court's improper consideration of his bare arrest record affected the entire sentencing hearing and resulted in prejudicial error.

Finally, calculating a person's sentence based on crimes for which he or she was not convicted undoubtedly undermines the fairness, integrity, and public reputation of judicial proceedings.

Thus, all four plain error factors are met here, and resentencing is required.

## IV. Conclusion

For the foregoing reasons, we will remand the matter to the District Court for resentencing.[43]

---

[42] J.A. at 115.

[43] While Mateo-Medina has finished his term of incarceration, he remains subject to the remainder of his two-year term of supervised release, with all of the restrictions that supervised release entails. We are confident that resentencing that accurately reflects Mateo-Medina's minor criminal history will afford him some relief from those restrictions.