**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

                                      No. 19-2153

AARON MARTIN MERCADO-GRACIA,

    Defendant - Appellant.
_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:16-CR-01701-JCH-1)**
_____

Irma Rivas, Assistant Federal Public Defender, Albuquerque, New Mexico, for Appellant Mercado-Gracia.

Tiffany L. Walters, Assistant United States Attorney (John C. Anderson, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Appellee United States of America.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BACHARACH**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

      In this direct criminal appeal, Defendant Aaron Mercado-Gracia challenges his

three convictions for drug trafficking, conspiring to traffic drugs, and using a firearm

in relation to a drug-trafficking offense.  In upholding his convictions, we conclude: 1) The district court did not err in denying Mercado-Gracia's motion to suppress evidence discovered as the result of a traffic stop.  The traffic stop evolved into a consensual encounter during which the police officer developed reasonable suspicion to believe Mercado-Gracia was involved in drug trafficking.  That reasonable suspicion justified a brief investigative detention, during which the officer deployed his drug-sniffing dog, which alerted, leading to the discovery of a gun and two kilograms of heroin in the car Mercado-Gracia was driving.  2) The district court did not abuse its discretion in denying Mercado-Gracia's request to play during voir dire a video to educate prospective jurors on implicit bias.  Having jurisdiction under 28 U.S.C. § 1291, we, therefore, AFFIRM Mercado-Gracia's convictions.

## I. BACKGROUND

Just before noon on March 25, 2016, New Mexico State Police Officer Ronald Wood, with his drug-sniffing dog Arras, was patrolling Interstate 40 just west of Albuquerque.  The officer clocked Mercado-Gracia driving a Dodge Charger ninety-two miles an hour in a seventy-five-mile-an-hour zone, heading east toward Albuquerque.  Officer Wood pulled Mercado-Gracia over.

Mercado-Gracia provided the officer with his driver's license, car registration and proof of insurance.  At the officer's direction, Mercado-Gracia exited his vehicle and stood beside the patrol car while Officer Wood used his in-car computer to check these documents Mercado-Gracia provided.  Mercado-Gracia's driver's license indicated that he was from Phoenix, Arizona.  The car was also registered in Arizona

2

but to a Hector Ramirez Reyes. A third individual, Favian Reyes, had insured the car.[1] Although Mercado-Gracia first stated that his cousin Favian owned the car, Mercado-Gracia did not know Favian's last name. Mercado-Gracia then explained to the officer that Favian was actually "my lady's, uh, husband's cousin."[2] (I R. 338 (internal quotation marks omitted).) According to Mercado-Gracia, Favian had let him borrow the car to drive to Albuquerque.

While writing a speeding ticket, Officer Wood inquired about Mercado-Gracia's travel plans, asking what brought him to Albuquerque:

> Defendant: Just I own my own business —
>
> Officer Wood: Do you?
>
> Defendant: Yeah. It is a remodeling company. I'm trying to just like get going at it.
>
> Officer Wood: So you're coming to Albuquerque for work?
>
> Defendant: Oh no, just so I can drive around.
>
> Officer Wood: Drive around?
>
> Defendant: Yeah. I have a lady over here I want to meet.
>
> Officer Wood: Oh, okay. Well, I thought your lady was over there [back in Arizona]. This was her cousin's car.
>
> Defendant: Yeah, I know.

---

[1] The district court referred to this individual as Favian Reyes, while the parties refer to him instead as Fabian Reyes.

[2] Mercado-Gracia notes that both the defense and the Government transcribed this statement, instead, as his "lady's cousin." (Aplt. Br. 6 n.2.) But Officer Wood testified that Mercado-Gracia stated that he was driving "his lady's husband's cousin's car." (I SROA 52.)

3

Officer Wood: Oh, okay.

Defendant: (Inaudible) girl down here.

Officer Wood: I see.

Defendant: So I couldn't bring my car.

Officer Wood: Ah, I see. How long are you going to be over here?

Defendant: Where?

Officer Wood: Albuquerque.

Defendant: Who, me?

Officer Wood: Yeah.

Defendant: How long have I been here?

Officer Wood: No. How long are you going to be over here?

Defendant: Oh, I don't know. It depends. Probably just the weekend.

Officer Wood: Ah.

Defendant: Yeah. I have to go back to work Monday. I would like to make it back by Easter.

(Id. at 339.) The traffic stop occurred on the Friday afternoon before Easter Sunday. It is a seven-hour drive from Phoenix to Albuquerque. During this conversation, Officer Wood noticed that Mercado-Gracia "became increasingly fidgety, antsy, moving his hands and feet around," and "was answering [the officer's] questions, which should have had easy answers, with a question, and based on [the officer's] training, [this] was an attempt for the brain to buy time to fabricate a response." (Id. at 340.)

4

Officer Wood checked the vehicle identification number (VIN) on the Dodge Charger, completed writing the traffic ticket, and explained to Mercado-Gracia "the process to resolve the speeding citation." (Id.) The officer also checked to see if the VIN matched the documents Mercado-Gracia had provided the officer—it did—and then determined through NCIC that the vehicle had not been reported stolen.

Seven minutes after initiating the stop, Officer Wood handed back to Mercado-Gracia his driver's license, the car's registration and proof of insurance, gave him the speeding ticket, and told Mercado-Gracia, "Okay. You're free to go." (Id.) As Mercado-Gracia walked back to his vehicle, however, Officer Wood invoked "the old highway patrol 'two-step,'" United States v. White, 584 F.3d 935, 943 (10th Cir. 2009):

> Officer: Excuse me, Aaron.
>
> Defendant: Yeah?
>
> Officer: Is it okay if I ask you some questions?
>
> Defendant: What?

(I R. 3441.) Mercado-Gracia walked back to the officer, who was standing near the passenger door of his patrol car.

> Officer: Is it okay if I ask you some questions?
>
> Defendant: Regarding?
>
> Officer: Huh? Well, I'm just a little confused, is all, on your travel here, your trip. It's a little confusing to me, you know what I mean?

5

(Id. at 341.) The district court found that the officer's "tone of voice was cordial and friendly." (Id.)

The officer then questioned Mercado-Gracia for three more minutes:

> Officer Wood . . . asked [Mercado-Gracia] questions about whether he personally owns a car and why he did not bring it, and [Mercado-Gracia] replied that he has a car but that's the only car "we have at home." Officer Wood was confused because his answer indicated his lady had the car back in Phoenix, but [Mercado-Gracia] just said he was coming to Albuquerque to meet a lady. Officer Wood inquired whether he has a wife or girlfriend. [Mercado-Gracia] replied it was his partner, they had only one car, and he was here to see a girl. Officer Wood asked where in Albuquerque he was going, to which [Mercado-Gracia] responded that he did not know and that he had to call and meet her. Officer Wood asked for the woman's name, and after asking why he needed to know, [Mercado-Gracia] gave a first name. Officer Wood asked where he was going to stay, to which [Mercado-Gracia] revealed that he was going to rent a place and pay cash, because he did not bring his credit cards. Officer Wood inquired if the owner of the car knew [Mercado-Gracia] had his car and knew he was driving to Albuquerque with it, and he replied yes to both questions.

(Id. (record citations omitted).) The district court found that, during this exchange, Mercado-Gracia "had also become increasingly nervous, such that now when answering Officer Wood's questions, he would look down or away without making eye contact." (Id. at 342.) "Officer Wood had also noticed that [Mercado-Gracia's] keyring had only one key." (Id.)

> Officer Wood asked if [Mercado-Gracia] had any weapons in the car, to which [Mercado-Gracia] said, "No." . . .

> Officer Wood then asked if there were any drugs in the vehicle, to which [Mercado-Gracia] said, "No." When asked if he had any marijuana, [Mercado-Gracia] replied, "Not that I am aware of." When Officer Wood inquired about other drugs, [Mercado-Gracia] responded no. . . .

6

Officer Wood asked for permission to search the vehicle. [Mercado-Gracia] replied, "No," and when asked why, [he] explained that he "thought it was just my ticket." Officer Wood attempted to clarify by asking if he did not want the vehicle or his own property searched, but [Mercado-Gracia] said, "The whole thing" and "I know I have the right." At 12:08 p.m., Officer Wood responded, "No, definitely you do. So I'll be straight up with you. Right now I have some concerns, okay? And so what I am going to have to do is I'm going to deploy my canine on the vehicle, okay? He then explained that he was going to deploy his dog on the exterior of the vehicle because of concerns he had that [Mercado-Gracia's] travel plans did not make sense, but [the officer] did not further elaborate on his reasons when [Mercado-Gracia] asked about them. [Mercado-Gracia] looked into the patrol unit and his eyes widened, seemingly scared, that the dog was there to search.

(Id. at 342–43 (record citations omitted).)

Officer Wood called for assistance and patted down Mercado-Gracia for weapons. Finding none, the officer asked Mercado-Gracia to stand away from his vehicle. Officer Wood then deployed his drug-sniffing dog Arras for two minutes around the outside of the Dodge Charger, during which time Arras alerted. Officer Wood then handcuffed Mercado-Gracia and explained that Mercado-Gracia now had to accompany the officer while he applied for a search warrant for the car. A second officer arrived at this point. Mercado-Gracia then consented to the officers searching his vehicle.[3]

During that search, the officers found over two kilograms of heroin and a firearm. Based on this evidence, the United States charged Mercado-Gracia with 1) possessing one kilogram or more of heroin with the intent to distribute it, in

---

[3] Although he initially denied Officer Wood consent to search the car, on appeal Mercado-Gracia does not challenge the fact that, at this point in the encounter, he did consent to the officers searching the car.

7

violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A); 2) conspiring to possess, with the intent to distribute, more than one kilogram of heroin, see id. § 846; and 3) using or carrying a firearm during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). After the district court denied Mercado-Gracia's suppression motion, the case proceeded to trial. Defense counsel asked to show a video during voir dire to educate prospective jurors about implicit racial bias. The district court declined that request. The jury convicted Mercado-Gracia of all three charges, and the district court sentenced him to 180 months in prison. That sentence represented a mandatory minimum ten years in prison on each of the distribution and conspiracy convictions, see 21 U.S.C. §§ 841(b)(1)(A)(i), 846, to run concurrently, and a mandatory minimum five-year sentence on the weapons charge, to run consecutively to the two ten-year drug-trafficking sentences, see 18 U.S.C. § 924(c)(1)(A)(i).

## II. LEGAL DISCUSSION

On appeal, Mercado-Gracia challenges the district court's decision to deny his motion to suppress and the court's refusal to show the video on implicit bias during voir dire.

### A. The district court did not err in denying Mercado-Gracia's motion to suppress

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV.[4] This court reviews de novo "the ultimate question

---

[4] "The Fourth Amendment is enforceable against the States through the Due Process Clause of the Fourteenth Amendment." United States v. Hammond, 890 F.3d 901, 904 n.1 (10th Cir. 2018) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).

of reasonableness under the Fourth Amendment," and reviews the factual findings that inform the reasonableness determination for clear error. United States v. Cruz, 977 F.3d 998, 1003-04 (10th Cir. 2020). When this court reviews the "denial of a defendant's motion to suppress, we view the evidence in the light most favorable to the government." Id. at 1003.

### 1. The traffic stop began as a Fourth Amendment seizure but evolved into a consensual citizen-police encounter that did not implicate the Fourth Amendment

This Court has recognized three types of police-citizen encounters: (1) "consensual encounters which do not implicate the Fourth Amendment"; (2) "investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity"; and (3) "arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause."

United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018) (quoting United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996)). The traffic stop at issue here was a seizure for Fourth Amendment purposes. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005); see also Rodriguez v. United States, 575 U.S 348, 354 (2015). Mercado-Gracia does not challenge the validity of that initial stop. Instead, he contends that Officer Wood unreasonably prolonged the traffic stop. "[O]nce a traffic stop is completed, the driver must be allowed to leave unless '(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter.'" United States v. Gomez-Arzate, 981 F.3d 832, 842 (10th Cir. 2020) (quoting Bradford, 423 F.3d at

9

1156–57); see also Rodriguez, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

The district court determined that, after Officer Wood issued Mercado-Gracia a speeding ticket and returned his documents, the encounter between the two became consensual. Applying an objective reasonable person standard to the facts presented, see United States v. Gaines, 918 F.3d 793, 796 (10th Cir. 2019) (citing Florida v. Bostick, 501 U.S. 429, 436 (1991)), we review that determination de novo, see United States v. Rogers, 556 F.3d 1130, 1137 (10th Cir. 2009).

"A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." Bradford, 423 F.3d at 1158 (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." Id. (quoting West, 219 F.3d at 1176). In deciding whether an encounter between a police officer and a citizen is consensual or is instead a Fourth Amendment seizure, then, a court must determine "whether 'a reasonable person under the circumstances would believe [he] was free to leave or disregard the officer's request for information.'" Gomez-Arzate, 981 F.3d at 842 (quoting Bradford, 423 F.3d at 1158); see also Bostick, 501 U.S. at 437.

"We follow a bright-line rule that requires the driver's documents to be returned before the stop may be considered a consensual encounter." Gomez-Arzate, 981 F.3d at 842. "The return of a driver's documentation is not, however, always sufficient to

demonstrate that an encounter has become consensual." Bradford, 423 F.3d at 1158. In

considering whether an encounter is consensual, we consider several non-exclusive

factors applied to an objective reasonable person being stopped, including

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

Gomez-Arzate, 981 F.3d at 842 (quoting United States v. Spence, 397 F.3d 1280, 1283

(10th Cir. 2005)). "[N]o one factor is dispositive." Id. We focus "on 'the coercive effect

of police conduct, taken as a whole on a reasonable person.'" Id. (quoting Spence, 397

F.3d at 1283).

Here, seven minutes after he initiated the traffic stop, Officer Wood gave

Mercado-Gracia a speeding ticket, returned his driver's license, the vehicle's

registration and proof of insurance, and told Mercado-Gracia, "Okay. You're free to

go." (I R. 340 (internal quotation marks omitted).) Although an officer is not

required to inform a citizen he is free to go before the encounter becomes consensual,

see United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999), here Officer Wood

clearly did so. Mercado-Gracia understood because he began walking back to his car

before the officer called him by name and asked if he could ask Mercado-Gracia a

few questions. See Gomez-Arzate, 981 F.3d at 842-43 (rejecting argument that

11

calling motorist back to the patrol car after telling him he could go amounted to a coercive show of authority). The district court found that

> Officer Wood did not use an overbearing show of authority, he spoke in a friendly manner, and he let [Mercado-Gracia] walk back towards his own car. He was the only officer present on the side of a public interstate, did not display a weapon, did not touch or restrain Defendant and did not stand in his way.

(I R. 349.) The district court further found that Mercado-Gracia voluntarily consented to answer the officer's questions, noting that Mercado-Gracia "responded to Officer Wood's request with 'regarding,' walked back toward Officer Wood, and proceeded to answer Officer Wood's questions," and "did not act or express intent to affirmatively end the consensual encounter at any time before Officer Wood told him he would deploy his dog around the car." (Id. at 349–50.)

Considering the totality of these circumstances, we agree with the district court that an objectively reasonable person in Mercado-Gracia's position would have felt free to decline to answer Officer Wood's additional questions and go on his way. See United States v. Hunter, 663 F.3d 1136, 1140, 1144–45 (10th Cir. 2011) (holding traffic stop became consensual encounter after officer gave driver back his documentation and told him to have a nice day, before asking the driver if he could ask him some additional questions, and driver responded "yes"); United States v. Hernandez, 93 F.3d 1493, 1498–1500 (10th Cir. 1996) (holding defendant consented to further questioning while sitting in patrol car, after officer handed him back his license and registration and told him he could leave); see also West, 219 F.3d at 1174–77 (defendant consented to officer's questions after officer handed back the

12

driver's license, rental agreement for the car, and a warning before continuing to ask driver questions).

Citing United States v. Mendenhall, 446 U.S. 544, 558 (1980), Mercado-Gracia argues that "it seems unlikely that after a seizure anyone— particularly a person of color—would actually feel free to leave when recalled by a police officer." (Aplt. Br. 23.) This court has rejected interjecting race into the objective reasonable person test—at issue here—for determining whether a citizen-police encounter was consensual or instead a Fourth Amendment seizure. See United States v. Easley, 911 F.3d 1074, 1081 (10th Cir. 2018), cert. denied, 139 S. Ct. 1644 (2019). "Mendenhall's discussion of race . . . was in the context of assessing voluntariness, not seizure. While the test for voluntariness of consent accounts for some subjective characteristics of the accused, the Fourth Amendment's seizure analysis has always been an objective one." Easley, 911 F.3d at 1081 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)) (further citation omitted). "Indeed, the Tenth Circuit has specifically disclaimed considerations that could inject the objective reasonable person analysis with subjective considerations: '[W]e reject any rule that would classify groups of travelers according to gender, race, religion, national origin, or other comparable status.'" Id. (quoting United States v. Little, 18 F.3d 1499, 1505 (10th Cir.1994) (en banc)).

Importantly, in this appeal, there is no issue presented challenging the voluntariness of Mercado-Gracia's consent to the search of the car, after the drug dog alerted. Nor does the Government rely on consent to justify deploying the drug dog

13

in the first place. Instead, as explained in the next section of this opinion, by the time he deployed the drug dog, Officer Wood had acquired reasonable suspicion that Mercado-Gracia was engaged in criminal activity sufficient to justify a further brief detention while the dog sniffed the exterior of the car.

As for Mercado-Gracia's argument that no objectively reasonable person in his position would have felt free to disregard Officer Wood's additional questions and leave, the cases cited above, as well as innumerable other cases, have long concluded that, under the right circumstances similar to those presented here a traffic stop can become a consensual citizen-police encounter that does not implicate the Fourth Amendment. Mercado-Gracia's argument to the contrary is unavailing. We conclude that, under the totality of the circumstances presented here, an objective reasonable person would have felt free to decline to answer Officer Wood's questions, posed after the officer gave Mercado-Gracia back his identification and documents and told him he was free to go.[5]

**2. The district court did not err in determining that, during the consensual encounter, Officer Wood acquired reasonable suspicion to detain Mercado-Gracia briefly in order to deploy the drug-sniffing dog**

By the time Mercado-Gracia declined Officer Wood's initial request to search the car, the consensual encounter between the two had ended and the officer,

---

[5] In light of our conclusion that the traffic stop evolved into a consensual citizen-police encounter, we need not address the Government's alternative assertion that, at the time the officer returned Mercado-Gracia's documents, the officer already had reasonable suspicion to believe that Mercado-Gracia was involved in criminal activity to justify extending the stop.

therefore, needed reasonable suspicion to detain Mercado-Gracia further while the officer deployed his drug-sniffing dog.[6]  See United States v. Berg, 956 F.3d 1213, 1216-18 (10th Cir. 2020), cert. denied, 141 S. Ct. 605 (2020).  The district court concluded that the officer, by that time, had developed reasonable suspicion that Mercado-Gracia was engaged in criminal activity—transporting illegal drugs— sufficient to justify a brief detention to deploy the dog, based on the following: Mercado-Gracia's answers to the officer's questions were "inconsistent"—he provided confusing explanations for his trip to Albuquerque, he did not know the last name of the car's owner, and changed his answer as to who the owner was, first a cousin and then his lady's husband's cousin; he was traveling from Phoenix, a known drug "source city"; and he had become increasingly nervous during his interaction with the officer.  Reviewing de novo the district court's determination that these facts supported reasonable suspicion sufficient to justify a brief detention, see Ornelas v. United States, 517 U.S. 690, 694-99 (1996), we again agree.

The fact that Mercado-Gracia was from Phoenix, which authorities consider a "source" city, is not entitled to much weight.  See United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2001) ("Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity.").  Neither is nervousness, standing alone.  See Bradford, 423 F.3d

---

[6] A dog sniff occurring outside a car is not a search, see Felders ex rel. Smedley v. Malcom, 755 F.3d 870, 880 (10th Cir. 2014) (citing Illinois v. Ceballes, 543 U.S. 405, 409 (2005)), but it may involve an additional brief detention.

15

at 1157 (warning courts not to "overcount[]" nervousness). But here those facts add to the calculus of reasonable suspicion. So did Mercado-Gracia's response to the question whether he had any marijuana in the car—"[n]ot that I am aware of." (I R. 342.) Most compelling, Mercado-Gracia's description of his travel plans as reasonably understood by Officer Wood kept changing, as did his explanation of whose car he was driving. Further, he did not know the full name of the person who lent him the car. Officer Wood testified that these circumstances are consistent with a drug courier's general modus operandi: often, a drug courier will drive another person's car to a distant city, not knowing where in that city he is to go until he gets there and calls someone to make the delivery, then he will turn around and immediately return home. While Mercado-Gracia's suspicious travel plans could be explained instead by his traveling to Albuquerque to have an affair, the officer need not "rule out the possibility of innocent conduct" before acquiring reasonable suspicion of criminal activity sufficient to justify a brief investigative detention. United States v. Cortez, 965 F.3d 827, 834 (10th Cir. 2020), cert. denied, 2021 WL 161110 (U.S. Jan. 19, 2021). Further, "in assessing reasonable suspicion we defer to a police officer's training and ability to discern innocent conduct from suspicious behavior." Id. Considering the totality of these circumstances, the district court did not err in concluding that the officer had acquired reasonable suspicion of criminal activity to detain Mercado-Gracia briefly while the officer deployed his drug-sniffing dog. We conclude, then, that the district court did not err in denying

16

Mercado-Gracia's motion to suppress the drugs and gun found in the car he was driving.

**B The district court did not abuse its discretion in refusing to play a video during voir dire to educate prospective jurors on implicit bias**

"[F]ederal judges have . . . ample discretion in determining how best to conduct the voir dire." Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981) (addressing whether trial court should have asked voir dire question regarding bias based on race or Mexican descent). Mercado-Gracia argues that the district court abused its ample discretion in denying his request to show an eleven-minute video produced by the federal district court for the Western District of Washington to educate prospective jurors on implicit bias. We cannot agree.

By implicit bias, Mercado-Gracia means "unconscious assumptions that humans make about individuals." (Aplt. Br. 33-34 (quoting United States v. Mateo-Medina, 845 F.3d 546, 553 (3d Cir. 2017)).) Mercado-Gracia, who was born in Mexico, contends that "[t]here was a reasonable possibility that implicit bias against Mexican immigrants or nationals would influence a juror because of the political climate and nature of the charge[s]" filed against him. (Id. at 37.) More specifically, Mercado-Gracia cites historical "anti-Mexican sentiment" in the United States and contemporary political rhetoric that suggests "Mexico sends drug dealers to America." (I R. 655.) On that basis, Mercado-Gracia sought to use the video "to educate potential jurors about [such] implicit bias." (Id. at 653.) The video informs jurors that everyone has unconscious biases, urges jurors to be aware of their own

17

unconscious biases, and encourages jurors, during the trial, to ask themselves if they would reach the same decisions if the defendant, witness, or lawyer was of another age, gender, or race.  See "Unconscious Bias," http://www.wawd.uscourts.gov/jury/unconscious-bias (last visited Feb. 3, 2021).  The video, then, is not designed to identify for removal any specific jurors who hold biases against the defendant but aims instead to make all jurors aware of the possibility of their own subconscious biases.

In support of playing this video for the jury venire, Mercado-Gracia cited studies "demonstrat[ing] that implicit bias can be overcome by training, awareness, and active deliberation."  (I R. 654 (citing Hon. Mark Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions, 4 Harv. L. & Pol'y Rev. 149, 156-57 (Winter 2010)).)  The Government opposed playing the video, citing legal scholars and other studies suggesting that raising racial bias during voir dire actually risks injecting bias into jury deliberations.  See Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 869 (2017) (noting "the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at voir dire" because "[g]eneric questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations.  Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'" (quoting Rosales-Lopez, 451 U.S. at 195 (Rehnquist, J., concurring in the result))).

18

The district court declined Mercado-Gracia's request to show the video to the jury venire, ruling that "[s]howing the video is not necessary to protect Defendant's right to a fair and impartial criminal jury under the Sixth Amendment and is an inefficient use of Court time." (I R. 759.) While a trial court, in the exercise of its discretion, might decide to show such a video during voir dire, we cannot say here that the court abused its discretion in declining to do so.

On appeal, in support of his argument that the trial court abused its discretion in declining to play the video for the jury venire, Mercado-Gracia relies on case law addressing a different question—when a trial court must, at the defense's request, ask prospective jurors about the possibility that racial or ethnic prejudice might impact their ability to judge the evidence in a given case fairly and impartially.[7] But here, at the request of both the Government and the defense, the trial court asked prospective jurors the following question:

> So you have heard the charges involving the possession of heroin and possession of a firearm in connection with the drug charge.

---

[7] Among other cases, Mercado-Gracia cites <u>Rosales-Lopez</u>, 451 U.S at 189-92 (noting that, when the defendant requests it, the Constitution requires an inquiry into prospective jurors' potential racial or ethnic bias only under "special circumstances" where race is inextricably bound with the conduct of the trial, and that under the Court's supervisory authority federal courts must also permit inquiry into prospective jurors' racial or ethnic bias when the defendant is accused of a violent crime committed against a victim of a different race than the defendant); <u>Ham v. South Carolina</u>, 409 U.S. 524, 525-27 (1973) (holding trial court was constitutionally required to ask prospective jurors, at the defense's request, about their possible racial bias, where defendant accused of marijuana possession defended by asserting police framed him in retaliation for the defendant's civil rights activism); and <u>United States v. Aldridge</u>, 283 U.S. 308, 309-15 (1931) (holding trial court in capital murder case erred in not questioning, at defense's request, prospective white jurors about their possible racial bias against black defendant charged with killing white victim).

19

One thing I want to say to you is that the defendant is of Mexican ancestry and so what I want to know is whether any of you would be inclined to believe the defendant is guilty based on, you know nothing yet about the case, but based on the fact that he is of Mexican ancestry and is charged with these drug and firearm charges, any of you, are any of you inclined to think he is guilty based on those facts[?]

(IV R. 246-47.) On appeal, Mercado-Gracia argues this question was "inadequate" to make "jurors . . . aware of their potential for unconscious biases. A juror is unlikely to be explicit about an implicit bias." (Aplt. Br. 39.) But Mercado-Gracia cites no authority requiring a trial court to educate prospective jurors about implicit biases.

Mercado-Gracia complains that the question the trial court asked prospective jurors "served only to inform the jurors of the defendant's national origin, without asking questions designed to meaningfully reveal any prejudices." (Id.) But at trial, defense counsel agreed to the wording of this question before the district court asked it. Furthermore, during voir dire, the attorneys for each side had an opportunity to pose other questions to prospective jurors. While defense counsel did ask several voir dire questions, counsel could have asked, but did not ask, prospective jurors about any biases they might have against Mexican nationals or immigrants. Instead, both defense counsel and the Government told the trial court they preferred that the court itself ask prospective jurors about potential prejudice. The court did so, using the question approved by both sides. Defense counsel did not request the trial court ask any further questions.[8]

_____

[8] Before trial, defense counsel suggested three specific voir dire questions inquiring about possible racial prejudice. The district court ruled that it would "take up the

20

At the conclusion of trial, the court instructed jurors that it was the Government's "burden of proving the defendant guilty beyond a reasonable doubt," and it was jurors' "duty to base [their] verdict solely upon the evidence, without prejudice or sympathy. That was the promise that you made and the oath you took." (I R. 965, 975.)

Under these circumstances, we cannot conclude that the district court abused its discretion in the manner in which the court conducted voir dire.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Mercado-Gracia's three convictions.

---

issues regarding specific questions during the voir dire outside the presence of the jury, after the Court conducts its voir dire." (I R. 759.) During voir dire, however, defense counsel did not request that the court ask the specific questions counsel had previously proposed, nor did counsel seek to pose those question herself to the jury venire.